**PETROLEUM EXPLORATION,**
Plaintiff,

v.

**UNITED STATES of America,**
Defendant.

Civ. A. No. C–69–2–C.

United States District Court,
N. D. West Virginia.

Oct. 31, 1975.

Richard G. Herndon, Wheeling, W. Va., for plaintiff.

Helen E. Marmoll, Tax Div. Dept. of Justice, Washington, D. C., for defendant.

## MEMORANDUM OPINION AND ORDER

OREN R. LEWIS, Senior District Judge, Sitting by Designation.

The plaintiff is an integrated distributor and producer of natural gas in the geographical area of Eastern Kentucky known as the Clay-Knox Field. Almost all of the gas comes from wells located within the Clay-Knox Field, most of which are owned by the plaintiff. Some are owned by independent producers—most sell their gas to the plaintiff—there are no other buyers of natural gas in Clay County—the plaintiff together with the Knox Gas Company and Cumberland Valley Pipe Lines purchased all of the known production of natural gas in Knox County.

The plaintiff collects and distributes the gas thus produced to towns in or near the geographical area in question.

Bickering over the proper depletion allowance has been going on between the plaintiff and the Internal Revenue Service since the early 1930s—a settlement was agreed upon in 1933 wherein IRS used a price of 25¢ mcf for the depletion computation—this price was arrived at by using the so-called "roll back" from the 33¢ mcf sales price.

Although the record here made is silent as to the depletion claimed and/or allowed for the thirty years between

1933 and 1963, IRS has questioned and disallowed the amount claimed by the plaintiff for the years 1963 and 1964. After much further bickering IRS levied a deficiency assessment against the plaintiff for the years in question—the deficiency was paid and this tax refund suit followed in January of 1969.

Three United States district judges for the Northern District of West Virginia have devoted a considerable amount of time since that date in getting this case ready for trial—pretrial orders governing the trial, which was set for May 20, 1975, were entered by Chief Judge Robert E. Maxwell of the Northern District of West Virginia.

The Government demanded and was granted a jury trial for the fixing of the mcf price to be used by the Court in computing the plaintiff's depletion allowance for the years in question. The case was then assigned to the undersigned.

The plaintiff alleged there was no representative market or field price for gas in the Clay-Knox Field for the years in question—the Government claimed there was. Both sides produced documentary and expert testimony in support of their respective positions—both agreed that representative market or field price at the wellhead governs. Neither could or would define representative market or field price, or could or would give the Court any gauge or yardstick for the jury to follow in fixing the representative price to be used in computing the depletion in this case.

For these and other reasons stated at the conclusion of the May 20th hearing the Court ruled that neither party had produced sufficient evidence to establish a representative market or field price for natural gas in the Clay-Knox Field for the years in question. The jury was then dismissed, and the Government's motion for a directed verdict was denied

—the Court then announced that it would compute the plaintiff's depletion allowance for the years in question in accordance with Paragraph 14(e) of the pretrial order.[1]

Before so doing the Court requested that each side advise the Court of any comparable fields that might be used in making this computation and to suggest any alternative methods that they would like the Court to consider in making this computation—Both sides complied.

Further hearing on the method of computation to be used was held on August 25th at which time both sides presented additional documentary and expert evidence in support of and in opposition to their respective positions.

The Government offered little help in the premises—they suggested three so-called comparable areas, created in the main by adding a part or all of an adjacent county or so to all or a part of the Clay-Knox geographical area. They offered no alternative method of computing the depletion allowance, claiming there was a representative market or field price for natural gas in the Clay-Knox Field and that the Court erred in not so finding—they seem to take the position that since Treasury Regulation 1.613–3(a) provides for no other method of pricing gas for depletion purposes, no alternative method can be used absent the rare and unlikely event of finding a field without a representative wellhead market or field price—this in the face of the Court of Claims comment in the first and second *Hugoton* cases, 315 F. 2d 868 (1963) and 349 F.2d 418 (1965), and in *Panhandle Eastern Pipe Line Company v. United States*, 408 F.2d 690, 187 Ct.Cl. 129 (1969), wherein the Court said:

" . . . [W]e read the language in question to mean that the applicable regulation requires the use of a 'representative market or field price,' *if*

---

1. Paragraph 14(e), page 13, of the pretrial order provides that the Court shall determine what alternative methods shall be used to compute the plaintiff's depletion if a decision is had in this case that there is no representative market price.

an acceptable price of such nature can be established. Neither the court's decision . . . nor the regulation requires the impossible, i. e., the use of a price that cannot be determined *representative,* or as precluding us from applying some other formula that produces a fair result. To hold otherwise would mean that in the instant proceeding the Government has successfully presented to plaintiff a 'heads I win, tails you lose' proposition."

It is also significant to note that it was the Government in the first *Hugoton* case, not the taxpayer, that contended there was no representative field price.

The plaintiff contended in its pleadings and during the May 20th trial that there was no representative market or field price for wellhead gas in the Clay-Knox Field and that the Court should use the roll-back basis for the purpose of computing its depletion allowance.

They reiterated this position during the August 25th hearing and suggested four additional methods of computation, namely—

The average wellhead price of gas produced in Eastern Kentucky for the years involved.

The Federal Power Commission pricing policies, adjusted by the cost of gathering such gas.

The weighted average sale price of all unprocessed gas sold in the Clay-Knox Field, adjusted by the deduction of gathering charges.

The weighted average of wellhead sales of produced gas sold in a local utility market similar to that of the plaintiff's operation in the Clay-Knox Field.

The defendant's expert testified during the May 20th trial that the representative wellhead price of natural gas in the Clay-Knox Field was 15.9¢ and 17.6¢ per mcf for the years in question. The additional evidence introduced during the August 25th hearing for cross-

checking purposes disclosed substantially the same mcf prices for the years in question.

The plaintiff's roll-back prices for the years in question were 31.8 mcf and 31.3 mcf.

Kentucky wellhead prices were 23.9 and 23.7 mcf.

Eastern Kentucky gas was 26 mcf for both years.

The Federal Power Commission pricing policy permitted 25¢ mcf as the adjusted price for the years in question.

The weighted average sales price of all gas produced and sold in the Clay-Knox Field, less a gathering cost of 3¢ mcf, was 27¢ mcf for both years The weighted average price of gas sold at the wellhead in similar marketing areas to that of the plaintiff was 26¢ mcf for both years.

Gas sold in the nearby Virginia counties of Dickinson and Buchanan for the years in question was 27.4 and 27.5 mcf for the years in question.

■ Since neither side has suggested any comparable fields for the Court to consider in establishing the representative market or field price to be used in computing the plaintiff's depletion allowance for the years in question, the Court is compelled to use some other alternate method that produces a fair result.

In so doing the Court has weighed and evaluated all of the expert opinions and documentary evidence presented during the two hearings.

The Court has given no unusual meaning to the words used in the Treasury Regulation in question for computing depletion allowance.

"Market price" means the actual price at which the given commodity is currently sold or has recently been sold in the open market, that is, not at a forced sale, but in the usual and ordinary course of trade and competition between sellers and buyers equally free to bar-

gain, as established by records of late sales. See Black's Law Dictionary and authorities cited there.

"Field price" is synonymous with "market price"—to be used where the sale is made at the wellhead or in the immediate vicinity thereof.

"Representative" means to portray or typify—serving as a characteristic example—illustrative of a class. See Webster's Unabridged Dictionary.

■ In other words, a representative market or field price means the typical price that was demanded and received by a willing seller in the usual and ordinary course of trade during the years in question—not the lowest or the highest price.

Although the plaintiff produced most of the natural gas it distributed, the record here made shows that the company did purchase natural gas from others during the years in question from 15 to 53.9¢ per mcf.

The record here made further shows that the Government's suggested representative market price of 15.9 to 17.6¢ per mcf was established in the main by using the plaintiff's purchase of natural gas from the few independent producers in the Clay-Knox Field who had to sell to that company or not sell at all and from old contracts made under other than arm's-length transactions—their back-up prices of sales made in nearby fields were the lowest prices in the area, not the representative market or field price of that field—most of the sales used by the Government's expert did not meet the minimum requirements of the definition of representative market or field price as above made. They are considerably lower than the representative wellhead price for natural gas in Eastern Kentucky for the years in question and are substantially below those used in the Federal Power Commission statement of policy.

■ Neither of the experts found any material difference between the natural gas produced in the Clay-Knox Field and that produced in the eastern section of Kentucky. The representative wellhead price of natural gas in Eastern Kentucky was 26¢ mcf for the years in question.

This price is in line with the Federal Power Commission pricing policies, adjusted by the cost of gathering the gas but slightly lower than the weighted average sales price of all unprocessed gas sold in the Clay-Knox Field, adjusted by deducting the gathering charges.

This price is also in line with the price approved by IRS in 1933 [2] and apparently used for many years thereafter for computing the plaintiff's depletion allowance.

Therefore, it would appear from equity and justice that the plaintiff's gas for the years in question should be depleted at that rate, namely, 26¢ mcf for the years in question, and

It is so ordered.

The Court has not used the plaintiff's roll-back figures for the years in question in establishing the representative market price for the Clay-Knox Field because the plaintiff admits that some of the records supporting some of the cost figures are not available. If the roll-back method is to be used—and it apparently has been accepted and used by IRS in other cases—the taxpayer must maintain the necessary records to support the roll-back price.

Therefore IRS should forthwith compute the plaintiff's depletion allowance for the years in question at 26¢ mcf, and counsel for the defendant should prepare an appropriate judgment for the amount of tax refund, together with interest, if any, the plaintiff is entitled to, submit the same to counsel for the plaintiff for checking and for approval as to form, and then to the Court for entry.

---

2. Although the 1933 compromise settlement is not binding for the years in question, it has probative value for cross-checking purposes.